# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
### May 2000 Session

## STATE OF TENNESSEE v. THOMAS WAYNE OVERBAY

**Direct Appeal from the Criminal Court for Sullivan County**
**No. S40,007     R. Jerry Beck, Judge**

_____

**No. E1999-00840-CCA-R3-CD**
**September 5, 2000**
_____

Defendant was convicted by a jury of four counts of aggravated sexual battery and ten counts of rape of a child. In this direct appeal Defendant alleges he did not receive a fair trial because (1) the bill of particulars did not sufficiently inform Defendant of the charges, and (2) the prosecution violated <u>Brady v. Maryland</u> when it failed to turn-over potentially exculpatory evidence to Defendant pre-trial. Held: the bill of particulars adequately appraised Defendant of the crimes with which he was charged. Although the prosecution violated <u>Brady</u> when it failed to turn over potentially exculpatory evidence to Defendant pre-trial, the error was harmless. Judgment of the trial court affirmed.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

THOMAS T. WOODALL, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS and ALAN E. GLENN, JJ., joined.

Stephen M. Wallace, District Public Defender, Blountville, Tennessee, for the appellant, Thomas Wayne Overbay.

Paul G. Summers, Attorney General and Reporter; Elizabeth B. Marney, Assistant Attorney General; H. Greeley Wells, Jr., District Attorney General; Barry T. Staubus, Assistant District Attorney General; Teresa K. Murray-Smith, Assistant District Attorney General; and Gregory A. Newman, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

Defendant Thomas Wayne Overbay was convicted by a Sullivan County jury of four counts of aggravated sexual battery and ten counts of rape of a child. In this appeal Defendant alleges he did not receive a fair trial because (1) the bill of particulars did not sufficiently inform Defendant of the charges, and (2) the prosecution violated <u>Brady v. Maryland</u> when it failed to turn-over potentially exculpatory evidence to Defendant pre-trial. After a review of the record and applicable law we conclude that the bill of particulars adequately appraised Defendant of the crimes for which

he was charged. We also conclude that the prosecution committed a Brady violation when it failed to turn over potentially exculpatory evidence to Defendant pre-trial. However, Defendant cannot show that he was materially prejudiced by the violation, and thus the error was harmless. We therefore affirm the judgment of the trial court.

## I. Facts

In the fall of 1995 Defendant lived in Kingsport, Tennessee, with his girlfriend, Martha Lynn Lawson, their infant son, TAO, and three of Lawson's children from a prior relationship, SKJ, CJ, and AJ. (The victim and her siblings will be referred to by their initials.) Defendant and Lawson ended their living arrangement in January of 1996, and the proof at trial concerned Defendant's activities from September 1995 until the first week of January, 1996.

In September of 1995 Lawson began working at a Waffle House restaurant in Kingsport, and during the week of September 21, 1995, she began working the graveyard shift from 10:00 P.M. to 6:00 A.M. During this time Defendant was employed as a furniture mover at Grand Piano. The couple's work schedules overlapped in the early morning, as Lawson did not get home until 6:30 or 7:30 A.M., and Defendant had to leave for work around 5:30 to 6:00 A.M. Different adult persons helped with child care at this time of the day–coming over the night before or early in the morning to watch the children, and staying with the children until Lawson returned from work. Lawson's sister, Tammy Jennings, lived with Defendant and Lawson for approximately six weeks during the fall of 1995, and Lawson testified that she would watch the children on occasion. Defendant testified that two of his sisters, Tammy and Amber, would occasionally watch the children. Defendant testified that other adults were occasionally hired to watch the children, including persons named Bobby Hill, Regina Snodgrass, and Sarah Forbes. The testimony showed, however, that on weekday evenings Defendant was frequently responsible for child care when Lawson was at work. On weekends the children usually stayed at the homes of different family members.

All of Lawson's children, including SKJ, were in Defendant's care during the evenings in the Fall and Winter of 1995 up until some time in January of 1996. At that time SKJ was 5 years old. SKJ testified that beginning when her mother worked "graveyard" (referring to the Waffle House shift) the Defendant would wait until Lawson had left for work, and then sexually abuse SKJ. SKJ testified that the abuse consisted of Defendant placing his mouth on SKJ's genitals, Defendant's touching of SKJ's genitals, Defendant requiring SKJ to touch his penis, Defendant requiring SKJ to perform fellatio, and Defendant's touching of SKJ's genitals with his penis. SKJ testified that she could not remember the exact number of times that Defendant abused her, but that it was "a lot" and more than five times. SKJ testified that she did not tell anyone about the abuse because Defendant told her that he would whip her if she told, and that she was afraid of Defendant.

On cross examination SKJ testified that the abuse occurred every day except Friday, Saturday, and Sunday. When prompted to elaborate she stated that the abuse occurred every day of the week other than the weekends. When Defense counsel questioned her regarding the nature of

the abuse, he asked "one of the things you said he did to you was he put his private part in your private part, is that right?" SKJ responded with "Right." SKJ then agreed that this occurred more than ten times, but she did not know if it occurred more than twenty times. She also agreed that Defendant touched his mouth to her genitals every day of the week.

SKJ told her grandmother of the abuse in January or February of 1996. In March of 1996 SKJ was taken to the Advocacy Center in Blountville for a medical evaluation. Dr. Judith Fischer examined SKJ. Although Dr. Fischer's general exam revealed no abnormalities in SKJ's genetalia, a closer examination with a magnification device showed SKJ's hymen to be "blunted," or thinner than normal. The magnification device also showed SKJ's hymenal opening to be larger than normal. Dr. Fischer testified that this type of abnormality was consistent with penetration by a human finger or tongue, and perhaps consistent with partial penetration by an adult male penis. She testified, however, that total penetration by a penis would typically result in extensive damage and subsequent scarring, and her examination uncovered no evidence suggesting this type of trauma.

The State presented other incriminating proof in the form of statements made by the Defendant to Lawson on four separate occasions. In the spring of 1996 Lawson questioned Defendant about SKJ's allegations. Lawson testified that "he never said he wasn't guilty, he didn't say he wasn't guilty, he just said he wasn't going to jail for this. He was not going to jail for this. That was all that was ever said." The second statement occurred when Defendant moved to Texas in March of 1996, and Lawson went with him to Texas to discuss the future of their relationship. Lawson again raised the subject of SKJ's allegations, and she testified that "he never admitted, he never said, he just was always saying he wasn't going to go to jail for this."

Following Lawson's Texas visit, Lawson and Defendant continued to discuss the future of their relationship, and Defendant requested that Lawson bring their son to Texas to live with him. Lawson told Defendant that if she did she would be worried about the safety of their son given SKJ's allegations. Defendant replied that "what happened to [SKJ] it was [Lawson's] fault, because–because it didn't have anything to do with him, that it wasn't planned . . . . He said the only way that he could find relief he was at home with my children while I worked and he didn't go out anywhere." When questioned she clarified this answer by explaining that at this time Defendant and Lawson's sexual relationship was non-existent. Finally, Lawson went to Texas to visit Defendant again in June and July of 1996. During this time Defendant "said that he was not going to go to jail for this. If he went to jail, he was going to go to jail for something else. And then if I happened to be around and he happened to be arrested, he would just kill me and take care of it. He kept asking me if I knew what they did to people when they went to prison for things like this."

At trial Defendant testified and denied all of the charges. He also denied moving to Texas because he trying to flee prosecution.

Two of Defendant's younger sisters, Tammy Hohensee and Amber Quintillana, both testified on behalf of Defendant. Hohensee testified that she took care of Defendant and Lawson's children frequently on weekday mornings in the fall of 1995 when Defendant had to work. She

would typically arrive around 5:00 to 5:30 in the morning, and watch the children until Lawson returned home. She testified that sometimes Lawson's sisters, Tammy and Mary, would spend the night and Hohensee would see them in the morning when she arrived. Quintillana testified that she was living in the Kingsport area in the fall of 1995, and that she spent the night at Defendant and Lawson's home on one occasion. She testified that she saw or heard nothing that indicated that Defendant was sexually abusing SKJ.

Brenda Baker, a friend of Defendant's in Kingsport, testified on behalf of Defendant. She stated that she visited Defendant's home frequently in 1995, and that she saw no indications of child abuse. Baker's daughter, Sarah Forbes, also testified on behalf of Defendant. She testified that in 1995 she was 12 years old, and she babysat Defendant and Lawson's children on two Friday nights. On those nights she spent the night at the residence, and she saw and heard nothing that indicated that Defendant was sexually abusing SKJ.

Defendant presented testimony by Detective Darla Anderson of the Kingsport Police Department. Anderson testified regarding her interview of SKJ on March 4th, 1996. Anderson's notes from the interview reflected that SKJ told Anderson that Defendant "never touched my private with his private." On cross-examination Anderson testified that the March 4th, 1996, interview was the first interview with SKJ, and that it was difficult to get abused children to talk during the first interview. During subsequent interviews SKJ told Anderson that the Defendant touched SKJ's genital area, made SKJ touch his penis, made SKJ touch her mouth on Defendant's penis, and that Defendant had SKJ "sit on him."

Defendant also presented medical evidence through Dr. Robert Fay and Linda Iris Henerson, R.N. Dr. Fay testified that he did not examine SKJ personally, but he reviewed photographs of SKJ's genitalia taken by Dr. Fischer. He testified that although SKJ's hymen was thinner than average, and her hymenal opening was larger than average, both of these characteristics were not abnormal for a child of her age and weight. Linda Henerson testified that she performed a physical examination of SKJ in her capacity as a public health nurse for the Sullivan County Health Department. This exam was performed on November 15, 1995, when Defendant brought SKJ to the Health Department for a health screening. Henerson testified that this examination included a visual examination of SKJ's external genitalia, and that Henerson's notes from the exam showed that she did not observe any abnormalities.

## II. Analysis

Defendant alleges he did not receive a fair trial because (1) the bill of particulars did not sufficiently inform Defendant of the charges, and (2) the prosecution violated Brady v. Maryland when it failed to turn-over potentially exculpatory evidence to Defendant pre-trial.

## A. Bill of Particulars

Defendant argues that his conviction must be reversed because the prosecution's bill of particulars did not provide sufficient evidentiary details regarding the alleged offenses. As a result, Defendant alleges that he was unfairly surprised at trial. Defendant also argues that the prosecution had additional information regarding the time and place of the offenses, and that the insufficiency of the bill combined with the prosecution's non-disclosure constitutes reversible error under State v. Byrd. 820 S.W.2d 739 (Tenn. 1991).

The Rules of Criminal Procedure allow a trial court, on the defendant's motion, to direct the prosecution to file a bill of particulars "so as to adequately identify the offense charged." Tenn. R. Crim. P. 7(c). In Byrd our Supreme Court discussed when a bill of particulars is sufficient to meet the purposes for which a bill is required. 820 S.W.2d at 741. "According to applicable case law and treatises, the bill serves to provide [a] defendant with information about the details of the charge against him if this is necessary to the preparation of his defense, and to avoid prejudicial surprise at trial . . . . Furthermore, the bill of particulars enables the defendant to preserve a plea of double jeopardy." Id. (citations omitted). Information that may be required in the bill of particulars includes details as to the nature, time, date, or location of the offenses. State v. Speck, 944 S.W.2d 598, 600 (Tenn. 1997).

The Byrd court also directly addressed the utilization of a bill of particulars in child sex abuse cases when the victim, and therefore the prosecution, is unable to identify specific dates on which the alleged abuse occurred. Byrd, 820 S.W.2d at 741-42. Although the court noted that a minor victim often presents significant problems regarding specifics of the alleged crime, and thus a date-specific indictment is often not plausible, the court held that when the prosecution does possess information that narrows the time frame of the indictment it must disclose such information in the bill of particulars. Id. at 742. The court also held that if the prosecution is unable to give

> even an approximate time of the alleged offenses by means of descriptive reference, a conviction may nevertheless be affirmed if in the course of the trial it does not appear that the defendant's defense has been hampered by the lack of specificity. Conversely, a conviction must be reversed if trial testimony establishes that the state had in its possession, either actually or constructively, additional information that could have helped pinpoint the nature, time, or place of the offense, and withheld that information from the defendant.

Id. at 742.

We must consider Defendant's allegations with the above strictures in mind. Defendant was charged with 14 counts of rape of a child, and the indictment alleged that Defendant committed one act of child rape per week from September 1995 until January of 1996, except no offenses were alleged to have occurred during one week in October. With the exception of the date of each offense the language used for each count in the indictment was identical, and read in part "on or about [date] and [date] . . . did unlawfully, intentionally, knowingly, and feloniously have sexual penetration of

[SKJ]." Defendant filed a "motion for discovery," and requested, inter alia, information regarding "the exact date, time and place of the alleged offense." The State's response was brief, stating in part that the "dates of the offenses are contained in the Presentment. The State cannot be more specific. These offenses occurred at the victim's residence at 1382 Waverly Road, Kingsport, Tennessee in the evening hours while her mother was at work at the Waffle House in Kingsport." Defendant then filed a "motion to compel adequate response to motion for bill of particulars," and the State responded that the "State cannot be more specific as to the dates of the offenses due to the fact that the allegations were made by a child," and the "State would specifically state that the penetration was by the Defendant orally penetrating the victim's vagina and by the Defendant penetrating the victim's mouth with his penis, and by placing his penis into the victim's vagina and the Defendant placing his fingers and hands into the victim's vagina."

As previously discussed, at trial SKJ testified that Defendant placed his mouth on and manually touched SKJ's genitals, required SKJ to touch his penis and perform fellatio, touched SKJ's genitals with his penis, and penetrated SKJ's vagina with his penis. SKJ testified that she could not remember the exact number of times that Defendant abused her, but that it was "a lot," and that the abuse occurred every day except Friday, Saturday, and Sunday. Detective Anderson also testified about an interview with SKJ, during which SKJ told Anderson essentially the same details that SKJ testified to, but during which SKJ also said that Defendant "never touched my private with his private." Following the conclusion of the State's proof, the trial court required the state to elect what dates the offenses occurred on. The State picked one week day within each week-long period: 9/25/95; 10/2/95; 10/10/95; 10/24/95; 11/1/95; 11/8/95; 11/13/95; 11/21/95; 11/28/95; 12/6/95; 12/12/95; 12/20/95; 12/27/95; 1/1/96.

Defendant argues that the proof at trial establishes that the State possessed additional information regarding the alleged crimes that should have been disclosed to Defendant. Specifically, Defendant contends that the State knew that the victim was touched sexually by Defendant with considerable frequency, with the total number of assaults per week vastly exceeding the one offense per week alleged in the indictment. Defendant contends that the victim's and Detective Anderson's testimony shows that the State knew the exact nature of the sexual touching. Defendant also points out that the victim's testimony established that the victim was not raped by Defendant on Friday, Saturday, and Sunday of each week. Defendant argues that this proof shows that information regarding the specifics of the alleged crimes was within the prosecution's possession pre-trial, and that it should have been disclosed to Defendant because it would have helped Defendant pinpoint the nature, time and place of each alleged offense. As a result, Defendant argues that Byrd requires reversal.

We do not agree with Defendant's contention. The disclosure requirement set forth in Byrd is not independent of the fundamental purposes served by a bill of particulars. The disclosure requirement is designed to ensure that the bill of particulars will enable Defendant to prepare a defense, avoid prejudicial surprise at trial, and preserve a Defendant's ability to raise a claim of double jeopardy. Byrd, 820 S.W.2d at 741. Accordingly, the prosecution must disclose information sufficient to protect these constitutional rights. This does not mean, however, that the prosecution

must disclose all of the information in its possession regarding the time, place, and nature of the alleged crimes. The bill is not to be used by a defendant as a broad discovery device. Tenn.R.Crim.P. 7(c), Advisory Comm'n Comments. "A defendant should be given enough information about the events charged so that he may, with diligence, adequately prepare for trial . . . . A bill of particulars is not intended to be a means of learning the State's evidence and theories . . . ." State v. Stephenson, 878 S.W.2d 530, 539 (Tenn. 1994). The Byrd requirements are simply a threshold that must be crossed.

Here, when the prosecution's bill of particulars and additional response are viewed in this light it is clear that Defendant was appraised of the charges in such a manner that enabled him to prepare a Defense and avoid unfair surprise at trial. Defendant knew where the offenses were alleged to have occurred, the time of day, the span of time in which they allegedly occurred, and the nature of the sexual contact alleged by the victim. Defendant has simply not shown that his pre-trial preparation or method of defense would have been different had Defendant been appraised of exact details of the alleged offenses, the frequency of the offenses, and the fact that the offenses did not occur on Friday, Saturday, and Sunday. Phrased differently, Defendant has not shown that he suffered prejudice because the of the lack of disclosure.

To begin, pre-trial preparation by Defendant would have uncovered Martha Lawson's work schedule at Waffle House, and thus Defendant would have known that the offenses were not alleged to have occurred on weekends or during days when Lawson did not work. Thus Defendant's claim that he was prejudiced because he did not know that the alleged offenses did not occur on Friday, Saturday, or Sunday is without merit. Second, Defendant was informed of all the types of offenses alleged by the victim: the "State would specifically state that the penetration was by the Defendant orally penetrating the victim's vagina and by the Defendant penetrating the victim's mouth with his penis, and by placing his penis into the victim's vagina and the Defendant placing his fingers and hands into the victim's vagina." Although the prosecution knew that the victim would testify in slightly more detail, Defendant knew what conduct he was being accused of. Finally, although Defendant claims that had he known the alleged frequency of the offenses he would have had prepared differently for trial, we cannot see how this argument has merit.

Defendant argues that had he known of the increased number of alleged offenses he would have had greater incentive to locate and interview adult relatives and friends who either lived in the home or stayed as overnight guests in order to watch the children. Defendant's brief states that

> This change in the nature of the accusation had an effect on the investigation of the case. As the offenses were alleged to have occurred in his own home, it was highly unlikely that he could establish an alibi. However, there was evidence that other adults, such as the victim's aunt, either lived or stayed overnight at the appellant's home during the period included in the presentment. Prior to trial, the defense did not investigate evidence that would have established a date that another adult would have been in the household overnight. During the trial, witnesses for both the prosecution and the defense all agreed that there were occasions in which other adults

-7-

were present in the house on weekday nights. However, establishing a date would be of little value to the defense as the prosecution could simply claim the offense occurred on another day that week. If, however, the accusation is that the offense occurred four to five times a week excluding weekends, evidence proving the presence of another adult in the house on a date certain is much more likely to be exculpatory. Had the defense known that Keagan Jennings had told police officers that the offenses happened "all the time", they would have had an incentive to investigate evidence establishing the dates of visits by other adults.

We fail to see how an allegation of five offenses per week in the indictment would have increased Defendant's incentive to locate these witnesses. Whether Defendant is accused of one offense or five offenses per week, the crucial ingredient is the fact that the indictment is not date-specific. In both instances any adult who stayed or lived in the home would be a primary source of information for what life in the home was like and what kind of interaction Defendant had with the victim. If Defendant had known that the victim was alleging multiple offenses per week his incentive would have been to get information regarding as many of the days within the scope of the indictment as was possible. However, given that the prosecution did not allege specific dates in the indictment, Defendant's incentive regarding the allegation of one offense per week was the same. Defendant still needed to get information regarding as many of the dates within the indictment because Defendant would need evidence to rebut any date the prosecution set forth as the exact date of the offense.

Assuming, arguendo, that the bill of particulars is insufficient under <u>Byrd</u>, we note that the prosecution had no additional information regarding the time, place, or nature of the offenses that it could have disclosed to defendant. As discussed above, Defendant knew everything the prosecution knew–albeit in lesser detail. The non-disclosed evidence here contained no descriptive references that would have furthered Defendant's ability to prepare a defense. Accordingly, under <u>Byrd</u>, if "the state is truly unable to give even an approximate time of the alleged offenses by means of descriptive reference, a conviction may nevertheless be affirmed if in the course of the trial it does not appear that the defendant's defense has been hampered by the lack of specificity." 820 S.W.2d at 742. As our prior discussion evidences, Defendant has not shown how his defense was prejudiced by the bill's lack of specificity. Defendant is not entitled to relief on this issue.

### B. <u>Brady</u> violation

Defendant alleges that the prosecution violated <u>Brady v. Maryland</u> when it failed to turn over interview notes from a March 4, 1996, interview of the victim by Detective Darla Anderson of the Kingsport Police Department. Defendant contends that the interview notes are potentially exculpatory, and thus the failure of the prosecution to produce the notes during pre-trial disclosure violated Defendant's due process rights.

In <u>Brady v. Maryland</u> the United States Supreme Court held that "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the

evidence is material either to guilt or punishment." 373 U.S. 83, 87 (1963). When such evidence is suppressed a due process violation occurs irrespective of the good or bad faith of the prosecution. Id. Evidence that is favorable to the accused includes that which may be used to impeach the prosecution's witnesses. Giglio v. United States, 405 U.S. 150, 154-55 (1972). A defendant must prove four criteria in order to establish a due process violation under Brady:

1. The defendant must have requested the information (unless the evidence is obviously exculpatory, in which case the state is bound to release the information whether requested or not);

2. The state must have suppressed the information;

3. The information must have been favorable to the accused; and

4. The information must have been material.

State v. Edgin, 902 S.W.2d 387, 390 (Tenn.), amended on reh'g (Tenn.1995) (citations omitted).

The Defendant has the burden of proving a constitutional violation by a preponderance of the evidence. Id. at 389 (citing State v. Spurlock, 874 S.W.2d 602, 610 (Tenn. Crim. App. 1993). In Kyles v. Whitley the United States Supreme Court held that the materiality of the undisclosed evidence is determined by asking if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. 514 U.S. 419, 434 (1995). The Court elaborated by stating that "the question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." Id. If there is a delayed disclosure of information, in contrast to a complete failure to disclose exculpatory information, Brady does not normally apply unless the delay itself causes prejudice. State v. Danielle Jordan, No. 01C01-9801-CR-00021, 2000 WL 85364, at *10, Davidson County (Tenn. Crim. App., Nashville, Jan. 27, 2000)perm. app. pending; State v. Joan Elizabeth Hall, No. 01C01-9710-CC-00503, 1999 WL 34782, at *9, Lincoln County (Tenn. Crim. App., Nashville, Jan. 28, 1999) perm. to appeal denied (Tenn. 1999) (citations omitted).

Defendant argues that Brady applies to interview notes from a March 4, 1996, interview of the victim by Detective Darla Anderson of the Kingsport Police Department. Defendant contends that the notes are exculpatory because they do not support the prosecution's allegation that the Defendant forced SKJ to perform fellatio, and because the notes contain a statement by SKJ that Defendant "never touched my private with his private." Defendant points out that exculpatory information was specifically requested by Defendant in a "Motion for Discovery" filed pre-trial, which asked for

any and all evidence in possession of the state or in the possession of any governmental agency that might fairly be termed 'favorable,' whether that evidence either be completely exculpatory in nature or simply tends to reduce the degree of the offense or punishment therefore, or whether that evidence might be termed "favorable," in the sense that it might be fairly used by the defendant to impeach the credibility of any witness the government intends to call in this matter . . . .

The prosecution did not turn Anderson's notes over pre-trial, but did disclose the notes to Defendant following the victim's testimony during the prosecution's proof-in-chief. After the State's proof Defendant moved to dismiss the case based on the prosecution's failure to disclose the notes, but the trial court overruled the motion, holding that Defendant failed to prove the materiality requirement set forth in Brady.

We first examine Defendant's contention that Anderson's notes are potentially exculpatory. As regards the statement Defendant "never touched my private with his private" we agree with Defendant. However, we do not agree with Defendant's assertion that the notes are exculpatory in general because they do not support the allegations that Defendant required the victim to perform fellatio. The notes were entered into evidence and published to the jury, and the last paragraph reads in part "[SKJ] said Tommy would put his private in her mouth until white stuff would come out."

Although we agree that the statement regarding penile penetration is potentially exculpatory, Defendant is not entitled to relief because we conclude that Defendant has failed to establish the materiality criterion of Brady  We base our holding on different grounds than the trial court. Because the interview notes were disclosed to the defense during trial, Defendant must show that the delay in disclosure caused prejudice to Defendant. Jordan, 2000 WL 85364, at *10; Hall, 1999 WL 34782, at *9. Defendant has not shown any such prejudice. The notes were disclosed before the victim was excused as a witness, and as a result Defendant was able to cross-examine the victim regarding the content of the notes. Defendant was also able to call Detective Anderson to the stand as part of Defendant's proof and the statement that Defendant "never touched my private with his private" was read into the record. The notes themselves were made an exhibit and published to the jury. Finally, Defendant presented a very strong defense regarding penile penetration, including medical proof that contradicted the victim's assertion that Defendant penetrated her with his penis. We do not think that there is a reasonable probability that, had the evidence been disclosed to the defense pre-trial, the result of the proceeding would have been different. Defendant received a fair trial, and thus is not entitled to relief.

### III. Conclusion

For the above reasons we AFFIRM the judgment of the trial court.

_____
THOMAS T. WOODALL, JUDGE

-10-